UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:14-cr-84 |
| | ) | |
| GERARDO PINEDA | ) | Judge Mattice/Carter |

REPORT AND RECOMMENDATION

I. Introduction

The defendant's Motion to Suppress (Doc. 17) and post hearing brief in support (Doc. 41) along with the government's responsive briefs are before the undersigned Magistrate Judge having been referred by the District Court for a Report and Recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C). Defendant Gerardo Pineda (hereinafter referred to as "Defendant") moves to suppress all evidence seized as a result of a vehicle search conducted on November 19, 2013. Hearings were held on defendant's motion on November 18, 2014 and December 1, 2014. Because I find (1) the officers had probable cause to arrest the Defendant for criminal impersonation, (2) the officers did not search the vehicle prior to the drug dog alert, and (3) probable cause was established by the alert of a properly trained narcotics canine, I conclude the search of the Defendant's vehicle did not violate the Fourth Amendment. I therefore RECOMMEND the Defendant's motion to suppress be DENIED.

1

## II. Relevant Facts

November 18, 2014 Hearing:

At the November 18, 2014 hearing, Officer Joshua Nix of the City of Cleveland, Tennessee Police Department testified about the arrest of Defendant on November 19, 2013. Nix, who had been with the Cleveland, Tennessee Police Department for 13 years, testified that he responded to a dispatch report involving Samantha Duran, a possible runaway from Sevier County, in the company of Juan Pineda. The call, which came in from dispatch at approximately 4:03 p.m., said the suspected runaway was in a green Honda at a chiropractor's office on Mouse Creek Road in Cleveland, Tennessee.

When Officer Nix arrived, he saw the green Honda Civic in question in the parking lot of the chiropractor's office. He parked off to the side, not directly behind the Honda. Nix recalled that the Honda was very close or directly across from the main entrance to the chiropractor's office. Officer Nix said that he and Bradley County Sheriff's Officer Steve McCullough both arrived at approximately 4:16 p.m. and approached the Honda. Officer Brown also arrived and went inside the Chiropractor's office. Nix went to the passenger side of the Honda and McCullough to the driver's side. Both the driver's side and passenger's side windows were down. Nix did not observe any drugs or other illegal material in plain view. Defendant was inside the Honda. McCullough asked him for identification. Defendant provided a Tennessee ID with the name Juan Vasquez Tomas that appeared to both officers to be fake. When Defendant was asked if he had another ID, he provided a Florida Department of Corrections ID with the name Gerardo Pineda. At that point, Officer Nix planned to arrest Defendant for the misdemeanor offense of criminal impersonation. Defendant was not free to leave. Defendant, however, was

2

never charged with criminal impersonation. Nix explained that because narcotics were found, the crime of criminal impersonation would have been a lesser offense.

At that point, Officer Nix went inside the chiropractor's office, while Officers McCullough and Bradley County Sheriff's Officer Robert O'Daniel remained outside. Officer Nix testified that the woman inside the chiropractor's office, Ms. Samantha Burd, initially gave a different name to Officer Brown. Eventually, Officers discovered that Ms. Burd had an outstanding arrest warrant. Although Officer Nix in cross-examination answered affirmatively that Ms. Burd had given the name Samantha Duran, in later cross-examination he confirmed that he did not review the paperwork and did not know what name Ms. Duran used at the office.

Officer Nix was inside for five to seven minutes, and then went back outside to find Drug Task Force Officer Russell Fredericks doing a K9 sniff on the Honda. Defendant was in the back of Officer McCullough's cruiser. Nix testified that the dog alerted on the car. Crystal methamphetamine and marijuana were found inside a plastic baggie in the center console.

Defendant called two witnesses, Dr. Angela McPherson and Mr. Rodney McPherson. Dr. McPherson owns the chiropractic clinic where the search of Defendant's car occurred. She testified that her employee, Mrs. Tonya Dyer, had suspicions that a new client, later identified as Ms. Samantha Burd, was a runaway. Mrs. Dyer showed Dr. McPherson website photos of a woman named Ms. Samantha Duran. Ms. Duran was reported as a runaway from Sevier County in 2012. Mrs. Dyer suspected that the potential patient, Samantha Burd, was Ms. Duran. The website photos of Ms. Duran said that Ms. Duran was found in 2012. In any event, Mrs. Dyer contacted law enforcement regarding her suspicions.

3

Dr. McPherson testified that Ms. Burd did not appear to be in emotional distress when she spoke with her in the treatment room.   Dr. McPherson was present when officers looked at the information Mrs. Dyer had concerning Ms. Duran and it appeared to her that the officers concluded that Ms. Burd and Ms. Duran were not the same person. According to Dr. McPherson, Ms. Burd did not resemble the photo of the kidnap victim. Dr. McPherson thought there was an approximately 10-or 15-year age difference between Ms. Burd and the suspected victim. Ms. Burd did not use the name Samantha Duran on her paperwork at the clinic. Dr. McPherson did not testify about her own concerns about the relationship between her patient and the defendant but from testimony of her husband it appears she also had serious concerns herself.

Mr. Rodney McPherson testified that he is married to Dr. Angela McPherson, and retired from the U.S. Army Corps of Engineers. He recalled getting a call from his wife to come to her office sometime around 3:00 on November 29, 2013. His wife was concerned about a new female patient who had a gentleman come in with her.   He was staying very close to her during sign-in and the pre-examination and she felt a little bit uncomfortable with that.   She had been in business for about 20 years and had never called him before over such a situation.   Upon his arrival, he learned that Mrs. Dyer called the police.   He told his wife he would go sit in the front lobby of the office. He sat in a chair near the front door, looking out the front window of the office.

Mr. McPherson testified he saw Defendant walk out the front door of the clinic.   Mr. McPherson was sitting in the front lobby when the first officers arrived and stayed in that same location for the entire search in the parking lot that afternoon.   Although there were multiple marked and unmarked cruisers on scene, he indicated they did not block his view of Defendant's

4

car. Mr. McPherson estimated it was about 30 feet from his location inside the clinic to Defendant's car. It was a clear day. He spoke to none of the officers in the clinic.

Mr. McPherson recalled seeing a single officer approach the driver's side door of the car and speak to Defendant. No other officers were present. This testimony was directly contradicted by the testimony of other officers including Officer Fredericks who confirmed the testimony of Nix and McCullough that they both approached the vehicle. Mr. McPherson next recalled that Defendant was placed in the backseat of a cruiser. After that, he saw other officers looking through the windows of the car. Mr. McPherson testified the officer who put Defendant in the back of the cruiser then returned to Defendant's car and began searching inside the car. He searched the car for three to four minutes. After he appeared to find something in the car, he went back to the cruiser, took Defendant out, and handcuffed him. At that point, there were other officers searching the car.

Mr. McPherson testified an officer then came inside and spoke to another officer who he later learned was DTF Officer Fredericks. Although he initially testified that the officer who came inside told Offcr. Fredericks about what was probably found in the car, he conceded on cross examination that he did not hear what was said. Mr. McPherson testified he then saw Offcr. Fredericks run his dog around Defendant's car. According to Mr. McPherson's testimony, the canine was utilized after several officers looked into the car.

Officer Fredericks was called by the Government as a rebuttal witness in the November 14, 2014, hearing. He arrived shortly before Officer Nix and Officer Brown, and parked in the far side of the parking lot, 25 or 30 yards from Defendant's car. Offcr. Fredericks saw two officers approach a green Honda in the parking lot. He went into the lobby of the chiropractic clinic. He

5

was inside the clinic lobby for five to seven minutes, at most. He stayed there in case something happened with the officers inside, and he did not look outside during that time. When he went outside, Defendant was in the backseat of the cruiser. Offcr. Fredericks testified he did not believe the car was searched before the dog's alert. However, he conceded that he did not know whether anyone searched the car before he got there. Offcr. Fredericks also testified no officer told him drugs were found in the car before his dog alerted. After his dog's alert, he was told drugs were found in the car.

December 1, 2014 Hearing:

A second hearing was held on December 1, 2014, in which the Government called Bradley County Sheriff's Officer Steve McCullough. Officer McCullough stated that when he arrived, he parked nearly three car lengths away from Defendant's car. Officer McCullough approached the driver's side door, and Officer Josh Nix approached the passenger side door of Defendant's car. Officer McCullough's testimony regarding the identifications provided by Defendant was consistent with Officer Nix's prior testimony on the issue. The first identification given looked fake. He confirmed that Officer Nix went inside the clinic, followed a short time later by Officer Robert O'Daniel of the Bradley County Sheriff's Department. Several other officers arrived on scene.

McCullough testified Officer O'Daniel came back outside of the office and asked for permission to search the car for a purse. Defendant refused consent. Officer McCullough, who had remained at the car, testified that no one searched the car before then. Officer McCullough then placed Defnedant in the backseat of his cruiser. While McCullough had Defendant in the backseat of his cruiser, his attention was not focused on the Honda the entire time. Rather, he was focused more on Defendant. McCullough stated he might have gone back to the Honda for a brief moment but that he did not go back to the car to search it.

The Government's final witness was Deputy Robert O'Daniel from the Bradley County Sheriff's Department. He testified that he was outside most of the time, but for one to two minutes that he went inside the clinic. On arriving, he walked to the Honda where the two officers, Nix and McCullough, were located. O'Daniel stayed on the passenger side when Nix went inside the office. O'Daniel testified he saw no one go inside the vehicle until he asked Defendant for consent. O'Daniel, while he was in the office, learned that the female inside had given a false name to the officers and that she had a purse in the Defendant's vehicle. O'Daniel had already seen the purse in the Defendant's car prior to going into the office. After leaving the clinic, Officer O'Daniel asked Defendant for consent to search his car for the purse. Defendant refused consent. At that point, McCullough placed Defendant in the back of his cruiser. Officer O'Daniel then stood at the back of Defendant's car and said that no one searched from that point until after the drug dog alerted. O'Daniel testified that after Defendant refused consent to search the car, DTF Officer Fredericks deployed his canine. That occurred at approximately 4:37 p.m., according to the CAD Operations Report. At that point Officer O'Daniel, and another officer on the scene, Sergeant Travis Smith of the Bradley County Sheriff's Office, began searching Defendant's car. O'Daniel testified this search was conducted after they were told by Offcr. Fredericks that his dog alerted on the car. He testified that the CAD Operations Report appeared to accurately reflect the events of the day as they unfolded at the scene but noted that there may be some delay between when an officer reports an event and when it is noted by the dispatcher. He acknowledged that the dispatcher was making regular entries involving the search that afternoon. Officer O'Daniel testified that the reason for requesting the dog was not that officers found something in the car, but that Defendant had refused consent.

### III. Analysis

In Defendant's original motion to suppress, he alleged that his detention/arrest was unlawful, and that the delay in deploying the drug dog exceeded the scope of the stop (Doc. 17,

Motion to Suppress, pp. 2-3). In the Defendant's post-hearing brief, Defendant concedes that he could have been arrested for providing a false identification document. Defendant notes, however, that he was not arrested for the offense of criminal impersonation (Tr. 41, Defendant's Post Hearing Brief, p. 7).

Defendant now argues that police officers searched his car without probable cause, and therefore the fruits of the search should be suppressed (Tr. 41, Defendant's Post Hearing Brief, at 8.) The Defendant also contends that even if the Defendant's witnesses were mistaken about the timing of the search, the officers still did not possess probable cause for the search of the vehicle (Tr. 41, Defendant's Post Hearing Brief, at 9.) The Government opposes the motion arguing the testimony at both hearings established that the officers had probable cause to arrest the Defendant for criminal impersonation, the officers did not search the vehicle prior to the drug dog being deployed and alerting, and the drug dog was a properly trained narcotics canine.

The call to the police:

Defendant has raised an issue regarding the propriety of the call to the police from Mrs. Tonya Dyer regarding Ms. Burd (Doc. 41, Defendant's Post Hearing Brief, pp. 3-4 and 9-10). The Government asserts it is not relying on the fact that Samantha Burd was a runaway or a kidnap victim. They argue that even if Mrs. Dyer was completely wrong regarding Ms. Burd's status, the officers were responding to the scene from a dispatch they had received regarding a possible criminal situation. An employee of the Chiropractic Clinic, Mrs. Tonya Dyer, had a suspicion that a new client of the clinic was a runaway. She had seen photos on a website and was sufficiently concerned to call the police. The proof showed that Dr. McPherson was sufficiently concerned about the situation to ask her husband to come to the office. Rodney McPherson testified that his wife had never asked him to assist her in such a manner in the preceding twenty years. Even if Ms. Burd did not resemble the victim from Sevier County, I conclude this does not invalidate the search. The Government refers to *Arizona v. Evans*, 514

U.S. 1, 11 (1995), in which the Court held that police officers may reasonably rely on erroneous information given to them.   In *Herring v. United States*, 555 U.S. 135, 137 (2009), the Court extended *Evans* in a case where police employees erred in maintaining records in a warrant database.   "Isolated" and "nonrecurring" police negligence lacks the culpability required to justify the harsh sanction of exclusion. 555 U.S., at 137, 144.

In this case, officers responded to a dispatch regarding criminal activity.   That is not disputed.   Immediately upon the officer's arrival, the Defendant committed the crime of criminal impersonation.   Even if the simultaneous investigation by other officers later revealed the report was incorrect, the offense was committed at the time of the officer's arrival.   The Defendant does not, nor could he, contest that the officers erred by asking him for his identification.

While conducting the investigation, officers discovered that the female was not the person Mrs. Dyer suspected to be a victim in the runaway report.   However, once officers identified her they also discovered she had an outstanding arrest warrant.   Upon finding that information, officers asked for permission to get her purse from the vehicle.   Defendant denied permission to search the vehicle which led to the search by the canine.

I conclude the search and the recovery of contraband from the car flowed from the Defendant's actions following his commission of the crime of criminal impersonation. Accordingly, suppression is not warranted on this ground unless the search occurred prior to the alert by the drug dog and therefore prior to the police having probable cause to search.

The Search of the Vehicle:

Defendant argues the vehicle was searched, without consent and without probable cause, prior to the drug dog alerting on the vehicle. Rodney McPherson's testimony differs markedly from the officers regarding this issue and supports the position asserted by Defendant. However, the testimony of several officers contradicts this.   Mr. McPherson stated that he observed the

officers search the Defendant's car prior to the drug dog being deployed but the officers assert that the search occurred after the drug dog alerted. This is a factual issue which the Court must resolve. The government bears the burden to prove factual determinations by a preponderance of the evidence standard. *See*, *United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"); *United States v. Bradley*, 163 F.Appx. 353, 357 (6th Cir. 2005)(same).

Considering the totality of the evidence presented, I conclude the Government has carried its burden with respect to this issue. The timeline established by the officers, whose testimony I found credible, shows that the search of the Defendant's vehicle did not occur until after the drug dog alerted. The United States does not argue that Mr. McPherson is lying or fabricating. They contend he was just confused as to what he observed. Mr. McPherson testified he saw an officer approach the driver's side door of the car and speak to Defendant. After that the officer placed Defendant in the back seat of a cruiser. After that he saw other officers looking through the windows of the car and that the officer who put Defendant in the back of the cruiser then returned to the car and began to search it for a period of three or four minutes. After that he recalls other officers searching. His testimony is that these events occurred before Officer Fredericks came from inside the building and ran his dog around the car. If those facts were accepted, the search was without probable cause, but his version of events and the details of the events are contradicted by several of the officers who were present. Defendant argues that Mr. McPherson was an unbiased observer of the events and that he had a good view of the scene (Doc. 41, Defendant's Post Hearing Brief at p. 7). On the other hand, the Government argues that Mr. McPherson, a civilian, would have no real reason to understand the critical nature of the timing of the search and that Mr. McPherson was also mistaken regarding small details: the number of officers initially present at the car, the timing of the handcuffing of the Defendant, whether the doors to the green

Case 1:14-cr-00084-HSM-CHS   Document 43   Filed 02/11/15   Page 10 of 12   PageID #: 343

Civic were open or closed.   Mr. McPherson also testified that the officer who removed the Defendant from his vehicle was the same officer who searched the vehicle prior to the deployment of the drug dog.   Officer McCullough testified that he removed the Defendant from his vehicle, took the Defendant to his (McCullough's vehicle), and remained with him there.   This is directly contradictory to the testimony of Mr. McPherson.

Officer Russell Fredericks, whose drug dog was later utilized, arrived at the scene after hearing the report of a runaway female.   When he arrived at the scene, he parked to the far side of the parking lot because he was wearing civilian clothes.   He watched as Officers Nix and McCullough arrived.   His testimony confirmed that both Officers Nix and McCullough approached the vehicle together.   Nix and McCullough also confirmed this.   The testimony of all three of these Officers is also directly contradictory to the testimony of Mr. McPherson.

The proof established that some officer was at the Defendant's vehicle continuously until the drug dog alerted.   Nix and McCullough arrived; Nix stayed until O'Daniel arrived.   Nix then went into the office.   McCullough and O'Daniel were at the vehicle until O'Daniel briefly went into the office (leaving McCullough at the vehicle).   Upon O'Daniel's return, McCullough removed the Defendant from the vehicle and took him to his police cruiser.   O'Daniel stayed at the Defendant's vehicle during that time.   Then, Fredericks deployed his drug dog and the officers searched.   I found the testimony of the Officers to be credible and conclude this testimony establishes that the officers did not search the Defendant's vehicle prior to Fredericks deploying his canine.   Admittedly, this timeline is contradicted by the Defendant's witness, Rodney McPherson.   However, I conclude the Government is correct and that Mr. McPherson was mistaken as to the sequence of events. To credit the recollection of Mr. McPherson on this issue, I would have to conclude that a number of officers have testified untruthfully under oath.   In light of the many inconsistencies in the testimony of Mr. McPherson, I conclude he was mistaken as to the timing of the events.

<u>Search after the drug dog alert:</u>

The Defendant does not appear to be contesting the validity of the search of the vehicle after the alert by the narcotics canine, although the Defendant does state "assuming *arguendo* that Mr. McPherson is mistaken about his observations of the search, Mr. Pineda submits that the officers still had no legal grounds to search his car based on the following." The Defendant then explores a number of theories on which the officers could not search (incident to arrest, lack of probable cause), but the Defendant does not address the issue of the canine alert (Tr. 41, Defendant's Post-Hearing Brief, Page ID# 317-19). Because the Government does not rely on any other justification for the search other than the dog alert, I will not address those arguments.

Officer Fredericks testified that he deployed his "trained and certified canine partner," and the dog alerted. Accordingly, I conclude the officers lawfully searched the Defendant's vehicle.

An alert by a properly trained and reliable narcotics canine provides probable cause for the search of a vehicle. *Florida v. Harris*, 133 S.Ct. 1050, 1057 (2013).

## IV. Conclusion

For the reasons stated herein, I RECOMMEND Defendant's Motion to Suppress (Doc. 17) be DENIED.[1]

S /William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S. Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).